RECEIVED
AFTER 4:30 P.M.

DEC 2 0 2005

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By_____Deputy

Brewster H. Jamieson, ASBA No. 8411122
LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone:  907-277-9511
Facsimile:  907-276-2631
Email:      jamiesonb@lanepowell.com

Attorneys for Defendants New York Life Insurance
Company, Paul Revere Life Insurance Company,
UnumProvident Corporation, and Genex

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

MARK R.M. HOLMSTRAND,

                    Plaintiff,

v.

NEW YORK LIFE INSURANCE COMPANY, a
foreign corporation; PAUL REVERE LIFE
INSURANCE COMPANY, a Massachusetts
corporation; UNUMPROVIDENT
CORPORATION, a Delaware corporation (d/b/a,
*inter alia*, Paul Revere Life Insurance Company;
Unum Life Insurance Company, a Maine
corporation; Provident Life and Accident Insurance
Company, a Tennessee Corporation; and GENEX,
a Pennsylvania corporation); and ROBERT
LEIMGRUBER, an Alaska resident,

                    Defendants.

Case No. A05-0066 CV (JKS)

**MOTION FOR PARTIAL SUMMARY
JUDGMENT ON BAD FAITH CLAIMS**

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

Defendants New York Life Insurance Company, Paul Revere Life Insurance Company,
UnumProvident Corporation, and Genex Services, Inc., by and through counsel, hereby move the
Court pursuant to Fed. R. Civ. P. 56 for partial summary judgment and an order dismissing in their
entirety all claims of bad faith made by plaintiff.  Under Alaska's two-pronged standard for insurer
bad faith, no reasonable fact finder could find that defendants acted with bad faith regarding
plaintiff's claims.

37

In fact, the evidence shows that plaintiff, through concealment and misrepresentation, defrauded defendants into making benefit payments. Only after the fraud was uncovered did defendants cease benefit payments. Under these circumstances, defendants could not have acted with bad faith as a matter of law.

Equally important to what this motion concerns is what it does not concern: Defendants are not asking at this time for summary judgment on plaintiff's claims for benefits under his Income Insurance Policy. At this writing, plaintiff has received full benefits payable under his policy, including back interest for the times he did not receive benefits, from August 11, 2000, until present. He continues to receive monthly checks for the full benefits payable under his policy, subject to a reservation of rights. The <u>only</u> topic of this motion is whether defendants' action of denying Mr. Holmstrand's claim for benefits between September 2004 and September 2005, under the circumstances fully described by this motion, could have been "bad faith" as a matter of Alaska law. For the reasons stated below, defendants respectfully submit that the bad faith claims against them should be dismissed.

## I.   <u>Policy Language</u>.

The language of the policy is crucial in determining whether defendants committed bad faith in this case. The policy at issue is an "Income Insurance Policy" originally issued by New York Life. Exhibit A (Document. No. 3188-201). The insuring clause provides in part as follows:

> Monthly Benefit. New York Life Insurance Company will *pay a benefit for each calendar month that the insured has a covered income loss* after the end of a waiting period and during a benefit term, if premiums have been paid as called for in the Premiums section.
> ...
> Covered Income Loss. *A covered income loss exists for any calendar month in which the insured has a loss of income of at least 20%*. If the loss of income for a month is 80% or more, the loss will be considered to be 100% for that month. *The loss must result, directly and apart from any other cause, from an accident or a sickness*.

*Id.*, p. 4 (emphasis added). Under the policy, benefits would not be owing if an employee left employment simply because he was tired of working, or wanted to change his lifestyle, or was terminated for reasons which had nothing to do with or involved causes other than a sickness or

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

accident.  In plaintiff's case, he would only be entitled to benefits if he suffered an "income loss" resulting "directly and apart from any other cause" from a "sickness."

## II.    The Facts Regarding Plaintiff's Claim.

A synopsis of the timeline, as set out more fully below, is as follows:

- On August 11, 2000, plaintiff was terminated from his employment for cause, namely, for repeatedly and egregiously verbally abusing his fellow employees. Plaintiff admitted that he committed this misconduct in an email he sent to his employer the following week.

- Plaintiff applied for disability benefits and represented that he had been "unable" to work due to his carpal tunnel syndrome and other causes; he did not disclose that he was terminated for cause due to misconduct; defendants initially denied the disability claim in August, 2001.

- On November 21, 2001, plaintiff entered into a confidential, global settlement of all claims between himself and his former employer, an essential element of which from Holmstrand's point of view was the employer's agreement to "cooperate" with his income insurance claim, including executing a letter drafted by Mr. Holmstrand and his lawyers.

- Plaintiff's former employer signed two letters to Defendants related to his disability claims which had been drafted by his plaintiff's attorneys.  These letters directly caused defendants to reverse the denial of benefits in August, 2002.

- When a return of a phone message from Mr. Holmstrand revealed that he was, in fact, operating a business, defendants undertook an investigation during the second half of 2003 and into 2004 which indicated that plaintiff's claimed hand injuries, and his abilities to use his hands, were completely at odds with what plaintiff had described.

- Commencing with his initial claim form and continuously thereafter, Plaintiff misrepresented his condition to defendants.

- Based on the surveillance and other new information, defendants stopped plaintiff benefits on September 10, 2004.

- Because of new information derived in the interview, defendants reinstated plaintiff's benefits, retroactive to the last denial, and will continue to pay the benefits with a reservation of rights, pending the resolution of this case.

## A.    On August 11, 2000, plaintiff was terminated from his employment for misconduct.

The claims in this lawsuit relate to plaintiff's employment by R&M Consultants, Inc. Plaintiff was Vice President in Charge of Surveying, Mapping and Computer Services.

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

Before the events which led to plaintiff's termination from his job, it is clear that he did not want to continue working. Exhibit B (Document No. DEF 264) is a February 9, 2000 file note by plaintiff's regular physician in which she documented plaintiff's stated concern that he "is tired of working and he simply cannot afford to retire."

During the same timeframe, plaintiff was becoming increasingly abusive towards his co-workers, James Rooney, CEO and President of R&M Consultants, testified at his deposition:

> Q. And can you identify at what point during his employment your opinion about him started to change?
>
> A. It would have been in the latter five years of employment.
>
> Q. And what was—what were the events or other circumstances that led you to have a changing opinion about Mr. Holmstrand as an employee and a co-owner at R&M?
>
> A. He was having health problems. He was going through some difficult times, personal times. And his personality changed. And it became more difficult to communicate with him.
>
> And some of the actions toward the end of his employment involved significant time off with pay, and supporting him through some of this effort, some of the problems we encountered *as he became somewhat aggressive and confrontational, and to the point he became abusive with the employees*. That's it.

Exhibit C, Rooney Depo., p. 10 ln. 7–p. 11 ln. 1 (emphasis added).

On August 11, 2000, plaintiff was terminated because of his abusive conduct towards several co-workers. The incident which "broke the camel's back" and led to plaintiff's termination is described in a August 21, 2000 statement by Rick Bennett, one of plaintiff's co-workers at R&M Consultants:

> On August 10, 2000 Mark Holmstrand came to my work area while I was working and starting yelling loudly at me. Mark screamed that Len and I had the best jobs in the city, I didn't have the "Balls" to talk to him about things and just left him notes on his chair, he proceeded to say that I was a "300 pound cry baby" ... he even made accusations that my wife had made a comment about him to someone (he never made that very clear) about his attitude; and ended with "you're stupid!"
> ...
> Then Mark started again. This time he said that I was a "Fucking 300 pound cry baby", I had no "Fucking balls and I was Fucking stupid." Then Mark saw Len in the hall and he told him to get his "Fucking ass" in here. Then Mark started

**LANE POWELL LLC**
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

on Len with the same yelling and profanity.   Mark told us that we were "Fucking stupid and our "Combined IQ" was not 100.

...

After Mark left, Len told me that Mark had been yelling at him in Len's office before he started on me.

Mark came back about one hour later and said that he was sorry for his outburst and ended with "Fuck you anyway!"

Exhibit D (Document No. RM 511-512).

As a result of this incident, and the others like it previously, the next day plaintiff was told by James Rooney to "go home" and was placed on administrative leave.  Exhibit C, Rooney Depo., pp. 30 ln. 17-22; 62 ln. 15-18.  Mr. Rooney testified that this was a termination for cause, not because plaintiff could not physically do the job, but because of plaintiff's temper, aggression and threatening conduct towards his co-workers; Mr. Rooney also testified that plaintiff never returned to work:

Q.   What was the reason, again, for him leaving in August of 2000?

A.   Termination for cause, I guess.

Q.   And, I take it, my understanding is that he was having problems, essentially, working with yourself and the other—other folks in your business; is that correct?

A.   Yes sir.

...

Q.   *And when he was terminated for cause, was that because he was unable to physically do any of his job?*

A.   *No.  No sir.*

Q.   Okay.  *So the reason why he was terminated was because he was—I guess for lack of better words—wasn't able to get along with you or his co-workers?*

A.   *That's correct.*

...

Q.   Mr. Holmstrand was terminated essentially because he couldn't get—get along with others.  It was worse than that, wasn't it?  *He was aggressive and threatening to your staff, wasn't he?*

A.   *Yes, sir.*

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631



> Q.   And when you told the people at Unum that you didn't have a position for him, it was because *you weren't going to tolerate having him work there given the way he had behaved?*
>
> MR. RUBIN: Objection. Foundation. Speculation.
>
> (BY MR. PARTNOW) Is that correct?
>
> A.   Yes, sir.
>
> Q.   *It had nothing to do with his carpal tunnel, did it?*
>
> A.   *No, sir.*

Exhibit C, Rooney Depo., p. 81 ln. 11–p. 84 ln. 8 (emphasis added).

Within a week of his termination, Mr. Holmstrand drafted a lengthy e-mail memorandum (dated August 17, 2000) to Mr. Rooney. Exhibit E (Document No. RM 608-09). Plaintiff admitted in the last paragraph of the e-mail that he was terminated because of his abusive behavior:

> Lastly, I agree that I failed to control myself on last Thurday [sic], in spite of your specific request that I do so. I let myself go into a verbal rage that I shouldn't have. It was unprofessional and distructive [sic]. I let you down. For all of these reasons, and especially the last one, I sincerely apologize.

**B.   <u>Plaintiff applied for benefits under his policy without disclosing that he left work due to termination for cause; defendants initially denied his income loss claim.</u>**

On February 23, 2001, Mr. Holmstrand submitted to defendants his claim form. Exhibit F. Plaintiff stated on the form that he had not been able to work since August 11, 2000, and listed as the reasons, "repetitive motion injury & repair surgery, complicated by diabetes, ADD and depression." Nowhere in his claim did plaintiff disclose to defendants that he had been terminated for his abusive behavior, which had nothing to do with any claimed disabilities. As a result, defendants did not know the real reason plaintiff left his employment until this lawsuit.[1]

---

[1] Melissa Kirby, currently Senior Disability Benefits Specialist with defendant UnumProvident (and UnumProvident's 30(b)(6) representative regarding the handling of plaintiff's claim), who handled plaintiff's claim, testified that she assumed that if plaintiff supplied defendants with information that it would be truthful information. Exhibit R, Kirby Depo., p. 71 ln . 10-16. As discussed below, the circumstances of plaintiff's separation from employment were kept confidential as the result of a settlement agreement between plaintiff and R&M Consultants.

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

Defendants initially denied plaintiff's claim for benefits in a letter of September 4, 2001. Exhibit G (Document No. DEF 00486-88). The denial was based on a finding that plaintiff did not have a "covered income loss" under the terms of the policy:

> Our Vocational Department has concluded that based on the available information in the file, it appears that the occupational demands of your occupation as a Vice President of Systems Management Information are within your current restrictions and limitations. As such, it is our determination that you do not have a Covered Income Loss, and no benefits are payable under your claim.

*Id.*, p. 2.

Plaintiff then submitted additional information in support of his claim, and defendants' Vocational Consultant spoke with plaintiff. Exhibit H. (Defendants' Appeal Decision (Document No. DEF 632-33)). However, defendants concluded that "[t]he new information did not change our previous opinion and the clmt remained able to perform the duties of his occupation." *Id.* Therefore, defendants confirmed the denial of plaintiff's claim on October 31, 2001. *Id.*

### C. On November 21, 2001, Plaintiff settled a dispute with his employer over his termination.

Almost immediately after plaintiff was terminated from his work in August 2000, he began secret negotiations with R&M Consultants over a variety of matters, including a severance package. Exhibit C, Rooney Depo., p. 23 ln. 30–p. 31 ln. 10. At the same time, plaintiff drafted his lengthy August 17, 2000, email to his former supervisor, Mr. Rooney. Exhibit E . Leaving aside the point that the length of this email seems at odds with Mr. Holmstrand's claim of his limited typing abilities, Mr. Holmstrand wrote: "I would like you to consider my departure from the firm to be an 'Early Retirement.'" *Id.* Mr. Holmstrand further described his departure as "appropriate at this time with regards to my medical issues, the excellent work of the long-term surveying and mapping staff in taking control of the management and marketing for our department, the currently ill-defined and misunderstood nature of my position, and the uncertain future of your retirement and the consequential future ownership of the firm." *Id.*

Mr. Holmstrand also indicated his willingness and ability to perform many or all of the duties he was performing when he was terminated. "I was looking forward to the possibility of getting involved in Oracle or other digital technologies presented by an outside buyer. If there is an

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

opportunity for this kind of involvement, I would like to be considered"; "If you desire, I could continue to work from home on retirement plan administration, on our internet website, and on the intranet administration 'webtools' I was developing." *Id.* This latter statement demonstrates that he was actively performing computer work up to the date of his departure and remained willing to do so even after his departure. Also significant is that just before plaintiff was terminated, he made purchases from his own pocket to re-build and repair his office computer, which is at odds with someone (a) who was so crippled as to be nearly unable to use his computer, and (b) nearing departure from his employment due to his inability to use his computer. *Id.*

A month later, similar sentiments were transmitted to R&M Consultants, through Mr. Holmstrand's attorney, who informed R&M Consultants that plaintiff was ready, willing and able to return to work. *See* Exhibit I (Document No. MH 3160-61), September 14, 2000, letter from plaintiff's counsel at Hughes Thorsness to R&M Consultant's counsel, Thomas P. Owens, Jr.; asserting: about plaintiff: "***He remains prepared to continue to perform the duties of his position***, and to provide any job related input, information or assistance and R&M might desire" (emphasis added).

The negotiations between plaintiff and R&M Consultants culminated in a November 21, 2001, Settlement Agreement. Exhibit J (Document No. RM 398). Because plaintiff had insisted with R&M Consultants that the Settlement Agreement be confidential, defendants were not aware of this Settlement Agreement until discovery was pursued in this lawsuit. Under the confidential Settlement Agreement, plaintiff was paid $795,000 and was given a vehicle and two computers he had used for his work. *Id.*, p. 2.

The Settlement Agreement also provided that R&M Consultants would "cooperate with Holmstrand in filing and prosecuting any disability claims by Holmstrand against any insurance carrier potentially liable therefor." *Id.* Pursuant to that provision, the Settlement Agreement included as Exhibit 2.e a form letter which R&M Consultants was to send in response to an inquiry about plaintiff's employment. The letter was drafted by plaintiff's attorneys. It described plaintiff's duties, but carefully omitted any mention of the fact that plaintiff had been terminated for misconduct, stating only that plaintiff "performed his duties in an able fashion." On December 6, 2001, R&M Consultants put this letter on its letterhead. Plaintiff or his counsel then transmitted the

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

letter to defendants.  Exhibit K (Document No. RM 520); Exhibit C, Rooney Depo., p. 42 ln. 11-25. Defendants did not know at the time that the letter had been drafted by plaintiff's counsel.

In addition, to the December 6, 2001, letter which plaintiff's counsel drafted for R&M Consultants, plaintiff wrote to defendants stating as follows:

> I have been unable to work since August 11, 2000 .... I have continuous pain, numbness and tingling in both of my hands.  It is difficult for me to grip a steering wheel for more than four or five minutes.  I am unable to write by hand for more than a few lines (two or three minutes) and typing is difficult to sustain for more than three or four minutes at a time.  I have carpal tunnel syndrome that is complicated by peripheral neuropathy. ... My position at work involved typing and writing 100% of the day.
>
> Accommodations were made for me at work on a gradual basis for several years until my productivity became minimal.

Exhibit L (December 20, 2001 letter from plaintiff (Document No. DEF 519)).

After considering plaintiff's December 20, 2001, letter (Exhibit L) and R&M Consultant's December 6, 2001, letter (Exhibit K), along with other information, on February 28, 2002, defendants again denied plaintiff's claim for benefits under the terms of his policy.  Exhibit H, Appeal Decision.

### D.  A further letter from plaintiff's former employer, also drafted by plaintiff's attorneys, caused defendant to reverse its denial of benefits.

However, after plaintiff submitted additional records, defendants determined that while plaintiff's duties had been divided among survey management, computer programming, and firm management and administration, it "was unclear" about which of these duties plaintiff was performing just prior to his last day of work.  *Id.*  Defendants requested this information from R&M Consultants.  *Id.*; Exhibit N (July 1, 2002, letter to R&M Consultants (Document No. RM 379). Unbeknownst to defendants until discovery in the current lawsuit, the response from R&M Consultants was actually written by the very attorneys who are representing plaintiff in this lawsuit.

On June 5, 2002, plaintiff's counsel wrote to R&M Consultant's stating that plaintiff was continuing to assert his disability claims, and that his counsel was enclosing another letter, written by plaintiff's new lawyers, Friedman Rubin & White, which R&M Consultants was to put on its

letterhead to be sent to defendants in support of plaintiff's claim. *See* Exhibit O (Document No. MH 2420-21):

> In that regard, Mr. Holmstrand has requested that I deal with you in proposing a letter which would be provided to the carrier more particularly describing Mr. Holmstrand's duties as a former employee of R&M and the physical demands of those duties. We have, accordingly, prepared the letter enclosed which is based substantially upon the form of letter prepared in conjunction with the settlement agreement.

On July 12, 2002, R&M Consultants put this proposed letter on its letterhead, and it was signed by Mr. Rooney. Exhibit P (Document No. DEF 612). Plaintiff or his counsel then forwarded this letter to defendants. Defendants did not know that the letter had in fact been authored by plaintiff's own counsel. The letter described plaintiff's work duties, and stated: "All three areas of employment did require the constant use of Mr. Holmstrand's hands, both in terms of typing and keyboard usage, as well as handwriting skills." The letter states that plaintiff performed all of his duties "just prior to the last day of work. Obviously, those duties required significant daily use of keyboarding and handwriting skills." Again, the letter as drafted by plaintiff's attorney carefully avoided any mention of the fact that plaintiff had been terminated for reasons of his temper and aggression, which had nothing to do with any difficulty in using his hands or any other claimed accident or sickness.

This July 12, 2002, letter purportedly from R&M Consultants caused defendants to reconsider and reverse the earlier denial of benefits. Because of this letter, defendants concluded that plaintiff was precluded from performing all of the duties of his occupation due to sickness and that he had thus suffered an income loss. Defendants therefore reversed the earlier denial of benefits under the policy and retroactively awarded full benefits. Defendants' Appeal Decision (Exhibit H), states:

> James Rooney responded in a letter dated 07/12/02, indicating that the clmt was responsible for all three duties just prior to his LDW [i.e., last day of work]. This new information was forwarded to our Vocational Consultant to perform an occupational review of the three occ's and determine if the clmt was precluded from performing the duties of his occupation.
> ...
> In summary, the new vocational information would change our prior decision to deny benefits and the clmt is precluded from performing the duties of this occupation.

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

The decision to reverse the denial was made on or about August 13, 2002. Exhibit R, Kirby Depo., p. 15 ln. 13-14. *And see* Exhibit S (Document No. DEF 636), an August 15, 2002, internal UnumProvident e-mail from Thomas Salce which states: "we need to give greater weight to the written info. I called him and explained to him that we were overturning the decision ...."; and Exhibit R, Kirby Depo., p. 73 ln. 6-10 ("At that point they had overturned the decision based on the written information we had received from the employer giving us apparently a more clear description of his occupation."). All back benefits were paid, with interest, and the maximum monthly benefit under the policy was paid to him every month thereafter.

### E.    Defendants subsequently developed information which indicated that plaintiff's claimed injuries to his hands, his activities and his income loss were not as he had represented.

On March 7, 2003, Melissa Kirby, a UnumProvident employee who was handling plaintiff's claim, received an e-mail message that plaintiff had called asking for information and had left his phone number. Exhibit T (Document No. DEF 659). Ms. Kirby called the phone number left by plaintiff, but instead of getting a message from plaintiff's home phone, Ms. Kirby's hand-written notes on the e-mail show that the voice-mail message indicated the phone number was for a motorcycle shop. *Id.* Ms. Kirby testified at her deposition:

> A.    At that point I went to return to Mr. Holmstrand's phone call using the number that was provided and Mr. Holmstrand did not answer and it was a voice mail instead.
>
> And the note I was making at the time because the voice mail didn't say this is Mark Holmstrand, I'm not here. It was you've reached–it was either Biff's Bike Works, Bogette's Bike Works which seemed–and I thought I had the wrong number and I tried to call back again, and again I got the same message.
>
> Q.    Is that written into the claim file?
>
> A.    It's made a note of Bogette's Bike Works. I started because I couldn't understand what he was saying. It says Bike HO and cell phone and Bogette's Bike Works. That's how the machine or the answering picked up, you reached Bogette's Bike Works, Biff's Bikes, Bogette Bikes.

Exhibit R, Kirby Depo., p. 84 n. 10–p. 85 ln. 6.

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

In fact, as will be seen further below, plaintiff was in the business of selling Bourget motorcycles.[2]

Ms. Kirby's suspicions naturally were aroused and she requested that plaintiff be placed under surveillance.[3] Recall from plaintiff's December 20, 2001, letter (Exhibit L) that he complained of continuous pain, numbness, and tingling in his hands, he claimed he could not grip a steering wheel for more than four or five minutes, and he claimed he could not type or write more than several minutes at a time. Exhibit L, Kirby Depo., p. 82 ln. 24-p. 83 ln. 24. She explained the reasons for the surveillance:

> Q.    Right. And how was the surveillance going to tell you whether he had a loss of income?
>
> A.    One of the insured's contentions is that he is unable to use his hands for any length of time. What I wanted to find out was, A) did he ride a motorcycle, and B) surveillance would show us if he had an actual motorcycle shop or somewhere he would be going to either sell motorcycles or doing something with motorcycles.

*Id.*, p. 86 ln. 12-19.

### (i)    <u>Evidence discovered prior to stopping benefits.</u>

During the surveillance, defendants obtained the following information which indicated that plaintiff's actual activities were greatly at odds with his previous claims of disability and loss of income (DVDs of the surveillance videos are attached as Exhibit U so the court may observe plaintiff's activities for itself):

- In April 2003, plaintiff was observed by defendants' investigator over a period of several days. Exhibit V, Investigator's Report, dated April 21, 2003, (Document No. DEF 686-95). The report, at p. 6, shows that while defendants' investigator was surveilling plaintiff's home when he was approached by a police officer who knew of plaintiff. The officer mentioned entanglements with plaintiff and the FBI. The officer also said that plaintiff was in the business of marketing Bourget motorcycles. The investigator confirmed from his investigation on the internet that plaintiff indeed runs a business from his home called "Biff's American Motorcycles" and that he

---

[2] "Bourget" refers to Bourget's Bike Works located in Phoenix, Arizona. The company manufactures expensive custom and production motorcycles and choppers. *See* their webpage at www.bourgets.com.
[3] None of the information provided by plaintiff to the defendants had indicated that he might be running a business or obtaining income from other employment.

**LANE POWELL LLC**
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

sells and markets "Bourget" motorcycles.    The web pages with this information, which web pages were maintained by plaintiff himself, are attached to Exhibit W (Document No. DEF 697-9). *And see* Exhibit X (Document No. DEF 696-98), which is a copy of an April 10, 2003, internal UnumProvident e-mail to Ms. Kirby which forwarded an e-mail (also dated April 10, 2003) from defendants' investigator regarding his findings about plaintiff's business.

- The April 21, 2003, report also records that the investigator observed plaintiff doing the following: opening and closing the doors of a pickup truck and a car; carrying sticks in his hand; bending over and using his hands to grab objects from his yard; and driving the pickup around town.

- In May 2003, over a period of several days plaintiff was observed by defendants' investigator as follows: using his hands to load a object in his vehicle, a new Hummer H2; using his hands to open and close the door of the Hummer; driving his Hummer to various locations around town; using his hands to carrying a leather jacket; using his hands to lift and close the tailgate of the Hummer; using his hands to carry a book; at another time, carrying a book in his left hand and a box in his right hand which he placed in his vehicle; using his hands to work on a motorcycle trailer at his residence; using his hands to carry a trash can from the street to his residence; using his hands to carry a suitcase, a handbag and large balloons from his vehicle into his residence; working on the interior and exterior of his Hummer; working on the ball and hitch of the Hummer.  Exhibit Y (Document No. DEF 809-20).

- In September 2003, over a period of several days plaintiff was observed by defendants' investigator as follows: driving a motorcycle to and from his residence to the Alaska Regional Hospital; using his hands to put on his helmet and jacket; using hand tools to work on his motorcycle; driving his motorcycle around town; using hand tools to install a license plate on his BMW motorcycle; reaching up and using his hands to unroll a flag on a pole extending from the garage; operating a vehicle around town; carrying a trash can with his left hand and bending over to pick up a trash can lid before placing the lid on the can.  Exhibit Z (Document No.  DEF 1397-1409).  The surveillance tape does not show plaintiff exhibited any discomfort from using his hands.

Regarding the last entry above, defendants found out during this lawsuit that plaintiff's visit to Alaska Regional Hospital was for a follow up visit related to a September 7th motorcycle accident (mentioned below).  Exhibit AA (Document No. DEF 2334-35).

None of the above information was known to defendants until they began the surveillance of plaintiff. Exhibit R, Kirby Depo., p. 89 ln. 9-17 ("...we had no mention from the insured that he's running any type of business, or there's any type of business involvement").

### (ii).    Information obtained in the course of this lawsuit.

During the course of this lawsuit, defendants have uncovered additional information about plaintiff's activities and condition prior to the stopping of benefits, which information plaintiff never disclosed to, and in fact concealed from, defendants. This information, which further supports and reinforces defendants' decision to stop the benefits, includes the following:

- Plaintiff sent the August 17, 2000, email memorandum to Mr. Rooney (Exhibit E (Document No. RM 608-09)), discussed above, in which plaintiff referred to his "retirement," stated that he was ready and willing to continue to perform the same computer duties he was doing before his termination, and acknowledged that his termination was due to his abusive behavior.

- Attached as Exhibit AB (Document No. MH-2382-2422), are copies of invoices from plaintiff's counsel, Hughes Thorsness. The invoices, which cover the period from August 17, 2000 to May 31, 2002, show that plaintiff was in constant contact with his attorney's through e-mail, which required the use of his hands to type on the computer.

- On March 15, 2001, plaintiff was cited by the Anchorage Police for driving his Porsche at a speed of 74 miles per hour in a 55 miles per hour zone. Exhibit AC (Document No. DEF 2279-83).

- On August 28, 2001, Mr. Holmstrand was involved in a motorcycle accident as he performed an illegal turn on one of his motorcycles, a BMW, at the intersection of 5th and Ingra. Exhibit AD (Police Report) .

- In early April 2002, plaintiff illegally affixed a wiretapping device to the outside of his ex-wife's house, a felony for which he was convicted and sentenced by Judge Singleton. Exhibit AE. Plaintiff personally performed the installation of the illegal listening devices.

- In August 2003, plaintiff's personal web site posted pictures of him off-roading in his Hummer. One picture shows the Hummer airborne, which the caption described a "lovely aerial exhibition of fine off-roading technique." Exhibit AF (Document No. DEF 2096-106)

- In September 2003 plaintiff advertised on an internet dating site where he posted a picture of himself riding a motorcycle, listed himself as "retired," and

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

listed his hobbies to include "Web Servers," "Car Racing Leagues," "Football Leagues," and "Martial Arts." Exhibit AG (Document No. DEF 1752-4).

- In another advertisement on the "Russian Brides Personals" dating website, Mr. Holmstrand described himself as "Happy, healthy, handsome, youthful, adventurous, romantic, artistic, talented, intelligent, loveable, family-oriented American." Exhibit AH.

- On September 7, 2003, Mr. Holmstrand was involved in another motorcycle accident, this time while operating his 2002 Bourgets Fat Daddy motorcycle. Exhibit AI.

**F.    Plaintiff misrepresented his condition to defendants from the outset of his claim and continuously throughout 2002, 2003, and 2004.**

In direct contrast to the above information and to what was (and continues to be) observed and discovered about plaintiff, prior to the stopping of benefits plaintiff continually and falsely portrayed himself to defendants as little more than a helpless and homebound cripple.

Attached hereto are Claimant's Supplement Statements submitted by plaintiff to defendants. These Statements were required on a monthly basis since benefits due under the policy are determined on a monthly basis depending on whether a covered income loss continues from one month to the next. The Statement form clearly warns that "Any person who knowingly, and with intent to injure, defraud, or deceive an insurance company, files a statement of claim containing any false, incomplete, or misleading information is guilty of insurance fraud, which is a felony." By signing the form, plaintiff agreed that "The statements made by me on this claim are true and complete."

At Exhibit AJ (Document No. MH 448-50, 453-55, 467-69), are plaintiff's Claimant's Supplemental Statements for 2002. In the October 9, 2002, Statement plaintiff writes: "I have limited use of my hands with pain." He lists his activities as "reading and some chores," and "caring for my children, physical therapy, medical appointments." He also claims that someone provided him with assistance in caring for himself: "A friend helps me with paperwork and chores." In the December 2, 2002, Statement plaintiff again claims "my hands are in constant pain and I have limited use." The December 2 and December 28 Statements also claim that plaintiff's activities are limited to "reading," "physical therapy," "some chores," "caring for my children," and that plaintiff is assisted in caring for himself by a "friend."

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511   Facsimile 907.276.2631

The Claimant's Supplemental Statements for 2003 are at Exhibits AK (Document No. MH 464-66, 470-75, 582-83, 1131-1132, 1122-23, 1152-53, 1171, 74, 1533-6, 1555-8, 1667-70, 1770-73), and are for the dates January 21, February 20, March 28, April 28, June 30, July 25, August 27, September 29, October 30, November 19, and December 18, 2003.  These Statements report that plaintiff has "constant" "pain," numbness," "aching" and "tingling" in his hands and fingers, and some Statements also report the same symptoms in plaintiff's arms, elbows and shoulders (*Id.* at Document No. MH 1152 and No. 1667).  Plaintiff claims in the Statements that his hands are "weakened," and that he had "limited" or "restricted" use of his hands.  The Statements continue to list plaintiff's activities as "reading," caring for self," "caring for children," "some chores," and "physical therapy."  He continues to claim throughout the Statements that he is assisted in caring for himself by a "friend," or his children.  For example, *see* the September 29, 2003 Statement (*Id.* at Document No. 1533), where plaintiff writes: "A friend helps me with food preparation and chores."

Plaintiff continued to make these same representations to defendants about his condition throughout 2004.  Attached as Exhibits AL (Document No. MH 1774-80, 1788-91, 1807-11, 1816-17, 1827-34), are Claimant's Supplemental Statements from January 29, February 27, March 29, April 27, June 29, July 22, and August 23, 2004.  They all show plaintiff continuing to describe his symptoms as "pain," "aching," "numbness," and "tingling" in his hands.  In some Statements, plaintiff claims that his hands, wrist, fingers and lower arms are "restricted" or "limited" in use due to the pain and other symptoms.  The Statements show plaintiff continuing to claim that his activities are limited to: "reading," "some chores," "physical therapy," "caring for self and children."  The Statements also show plaintiff continuing to state that he was being assisted by "a friend" "my two boys," and "children."

Nowhere in the Statements did plaintiff ever disclose to defendants that he was (1) operating a motorcycle dealership; (2) operating a motorcycle around town; (3) working on his motorcycle with hand tools; (4) involved in several accidents while operating his motorcycle; (5) driving other vehicles (including a Porsche, pickup truck, Hummer and BMW) around town; (6) operating his Hummer off-road and jumping the Hummer into the air; (7) using hand tools; (8) using his hands to work around his house and carry objects; (9) assembling and installing sophisticated wire tap surveillance equipment on the home of his ex-wife (for which actions he was convicted of

**LANE POWELL LLC**
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

federal wire tapping charges); or (10) extensively and regularly using his computer for heavy e-mail traffic and participation in a large number of websites and chat rooms which were apparently of interest to him.

In August 2004, because of the new information that had been uncovered during the surveillance, plaintiff underwent an Independent Medical Evaluation (IME). During that IME, plaintiff claimed to the IME physician: when using a computer "he has to switch off with his hands because of numbness or tingling worsened almost immediately as soon as he holds the mouse;" "he does not drive much because of the difficulties grasping the steering wheel;" his activities since being off work in August 2000 are "reading, trying to manage his money, and working with his teenage children; and, although he assists his children with their motocross activities, "he is not able to physically work on the motorcycle involved for this." Exhibit AM (Document No. DEF 2116).

### G.    Based on the new information, defendants stopped plaintiff's benefit payments.

In a letter of September 10, 2004, Ms. Kirby wrote to plaintiff informing him that his benefit payments were being stopped. Exhibit AN (DEF 2131-5). As indicated in the letter, this decision was based on the opinions of the IME physician, defendants' medical consultant, and the other information uncovered in the investigation and surveillance.[4]    The letter indicates at p. 2: "Based on our review of the information contained in your file, it does not appear that your income loss is due to an Injury or a Sickness as defined in your policy;" and summarizes defendants' findings at p. 5:

> Your reported limitations are not supported by the surveillance, which in fact seems to contradict the statements you made to the Independent Medical Evaluator. Your demonstrated activity level is difficult to reconcile with any claim of substantially reduced functioning level due to a physical impairment.
>
> Based on the information contained in your file, we are unable to support that your loss of earnings is due to any injury or sickness. ....

---

[4] Ms. Kirby testified at her deposition:
> Q.    Was the surveillance significant to you in your decision to terminate benefits in August of 2004?
> A.    Yes.

Exhibit R, Kirby Depo., p. 151 ln. 24 – p. 152 ln. 3.

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

**H.    After this lawsuit was filed, defendants reinstated plaintiff's benefits with a reservation of rights.**

After this lawsuit was filed, defendants reinstated plaintiff's benefits, retroactive to the September 2004 denial.  Exhibit AO, Letter of August 30, 2005.  These payments were made and continue to be made subject to a reservation of rights.  *Id.*  In early 2005, both before and after the commencement of this suit, Ms. Kirby had received a Clinical Review from UnumProvident registered nurse Andrea Brewster analyzing additional medical information supplied by Mr. Holmstrand, a further evaluation and recommendation from Michael D. Brandner, MD, a further opinion from UnumProvident medical advisor Dr. Nabil Malek, and a vocational review from an in-house vocational specialist.  Exhibit AP (Document No. NYLCL 01983-1996).  In early March, 2005, Ms. Kirby recommended obtaining further input from Dr. Malek and Dr. Brandner.  *Id.*, Document 1995.  In addition, this lawsuit was filed and served in February of 2005, which further confused and interrupted the claims appeal process.  *See* Exhibit R, Kirby Depo., p. 130 ln. 4–p. 131 ln. 13:

> Q.    ... why did it take until August of 2005 to pay the claim even subject to a reservation of rights?
>
> A.    Well, at this point there's a lot of information and everything is just kind of–you know, we're not sure exactly what's going on and the lawsuit came in March of '05. ... And we had met in August and determined that at this point while the litigation process is going forward we would pay the insured under reservation of rights until pretty much this is all kind of cleared up, a better picture.
>
> Q.    So is the decision to pay the claim based on this litigation?
>
> A.    I won't say wholly based on litigation.  It's based on the fact that we're not sure exactly–I mean, there's a lot of information here, and there's, you know, the different opinions.  And we're not actually sure at this point what the insured is able to do.  And we're finding out–I don't have all the resources that the litigators obviously have.

Finally, even as late as August, 2005, Ms. Kirby was unaware of the true facts concerning Mr. Holmstrand's departure from employment, as the depositions of R&M, and the production of documents from that firm, had not been made.

Thus, plaintiff is receiving checks for his benefits, and defendants will continue to pay the benefits, at least through the end of this case; whether plaintiff will continue to receive payments

thereafter depends how this case is resolved and the information developed during the course of litigation.

## ARGUMENT

### I.    Alaska Law Regarding Bad Faith Insurance Actions.

In *Hillman v. Nationwide Mut. Fire Ins. Co.,* 855 P.2d 1321, 1324 (Alaska 1993) (*Hillman II*), the Alaska Supreme Court discussed the standard for bad faith insurance litigation in Alaska. The *Hillman II* Court noted that in *State Farm Fire & Casualty Co. v. Nicholson,* 777 P.2d 1152 (Alaska 1989), it first held that insurers could be liable for the tort of bad faith in first-party cases. *Nicholson,* in turn, relied on cases from other jurisdictions which described a two prong test for bad faith: objective reasonableness and subjective bad faith conduct:

> In recognizing the tort of bad faith in first-party cases, we aligned Alaska with those jurisdictions that have followed *Gruenberg v. Aetna Insurance Co.,* 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (Cal. 1973), apparently the first case to apply bad faith as a tort in first-party cases. *Gruenberg* articulated the tort in a manner that seemed to require ***unreasonable conduct and bad faith***: "Accordingly, when the insurer ***unreasonably and in bad faith*** withholds payment of the claim of its insured, it is subject to liability in tort." *Gruenberg,* 510 P2d at 1038. A similar ***double requirement*** was imposed in *Noble v. National American Life Insurance Co.,* 128 Ariz. 188, 624 P.2d 866 (1981), another case on which we relied in *Nicholson.* The Arizona Supreme Court adopted the standard expressed by the Wisconsin Supreme Court in *Anderson v. Continental Insurance Co.,* 85 Wis.2d 675, 271 N.W.2d 368 (Wis. 1978):
>
> > The *Anderson* Court states:
> >
> > To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy ***and*** the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. It is apparent, then, that the tort of bad faith is an intentional one....
> >
> > The tort of bad faith can be alleged only if the facts pleaded would, ***on the basis of an objective standard, show the absence of a reasonable basis for denying the claim,*** i.e., would a reasonable insurer under the circumstances have denied or delayed payment of the claim under the facts and circumstances.
> >
> > 271 N.W.2d at 376-77.
> >
> > Under the *Anderson* standard ***an insurance company may still challenge claims which are fairly debatable***. The tort of bad faith arises when the insurance company intentionally denies, fails to process, or pay a claim ***without a reasonable basis for such action***.

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

*Noble*, 624 P.2d at 868.

*Hillman II*, 855 P.2d at 1323-24 (emphasis added).

While the *Hillman II* Court declined to expressly adopt the bad faith conduct prong (stating that the tort of bad faith "may or may not require conduct which his fraudulent or deceptive"), it did expressly adopt the "reasonableness" prong, holding that a bad faith action "necessarily requires that the insurance company's refusal to honor a claim be made without a reasonable basis." *Id.* at 1324. As noted above, where a claim is "fairly debatable," the insurer can challenge the claim without being in bad faith. *Id.*

*Hillman II* makes it clear that if the "reasonable basis" prong is not satisfied, a bad faith claim may not be maintained. That is, even if there might be an issue of fact as to whether an insurer acted fraudulently or deceptively in regards to the claim, or had an improper motive or intent in denying the claim, the bad faith claim will nevertheless fail if the insurer had a "reasonable basis" for its action. Thus, evidence going to an insurer's bad or improper motives, conduct or intent in denying a claim is irrelevant to a "reasonable basis" analysis.

Further, as noted above, the "reasonable basis" standard is an objective standard. *Id.*; *Sharpe v. Trail*, 902 P.2d 304, 310 (Alaska 1995) (Rabinowitz and Compton, JJ, dissenting: "Only recently in [*Hillman II*] did we deviate from this course by holding that in order to recover for the tort of bad faith in first party insurance cases, the insured must prove objective bad faith on the part of the insurer."). Thus, again, evidence of an insurer's subjective intent or motive in denying a claim is irrelevant in the "reasonable basis" analysis; "reasonableness" will be determined based on the objective evidence.

Moreover, the issue of reasonableness, and thus the question of whether the insurer acted in bad faith, can be a question of law for the court to decide: "Our position is merely that where the insurer establishes that no reasonable jury could regard its conduct as unreasonable, the question of bad faith need not and should not be submitted to the jury." *Hillman II*, 855 P.2d at 1325.

In *Hillman II*, the plaintiffs had presented a litany complaints which they said created a question of fact on the issue of reasonableness:

> The Hillmans argue that they presented evidence showing that Nationwide denied coverage before making *any* investigation of the facts or the law and that

Nationwide made subsequent, formal denials of coverage without having conducted significant investigation. They also argue that Nationwide's agents violated its guidelines and policies, which are intended to guarantee fair, honest and reasonable claims handling. Among others, this included violating the company policy requiring local adjustors to consult with higher echelons in the company before denying a death claim; failing to resolve all reasonable doubts about coverage in favor of the policy holder; withholding from the file any explanation for why the policy holder was required to sign a nonwaiver agreement; obtaining a legal opinion just to "paper the file" and for the main purpose of denying the claim; failing to provide a policy holder with a previously promised letter from Nationwide's attorney regarding coverage; lying to the policy holder about whether that letter was available; and "stonewalling" the claim for four years because of vindictiveness towards the Hillmans' attorneys. Finally, the Hillmans argue that even after Nationwide had given its personnel the authority to concede coverage and settle the underlying case for the $50,000 policy limits, its Regional Claims Attorney unilaterally decided not to do so.

*Id.*

These complaints mirror in essence plaintiff's complaints in the instant case; that is, that defendants denied coverage without sufficient investigation, and engaged in dishonest, unfair and unreasonable claims handling. However, in *Hillman II* the Alaska Supreme Court found there was no material issue of fact raised by this laundry list of complaints, either individually or in combination, because they were irrelevant to the determination of whether there was a "reasonable basis" for the denial of coverage. *Id.* at 1325-26 ("In our view none of these facts suffice to raise a factual question as to whether Nationwide's denial of coverage lacked a reasonable basis. ... The facts that Nationwide did not follow its standard procedures in denying coverage, that it did not forward its attorney's letter to the Hillmans, and that its $50,000 offer was conditioned on settling all of Hillmans' claims rather than their uninsured motorist claims, do not suffice to create a fact question as to whether Nationwide's decision to deny coverage lacked a reasonable basis, as they have little or no relevance on that point.").

For the reasons discussed below, in the instant case there is also no genuine issue of material fact on which to deny summary judgment for defendants. Plaintiff's claims that defendants had an improper intent or motive behind the denial of coverage or that defendants failed to follow proper procedure or conduct a proper investigation in the denial, are irrelevant to this motion as

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

stated in *Hillman II*.  Even if it is assumed for the purposes of this motion (as did the court in *Hillman II*), that defendants and their claims agents had every incentive to deny every claim in general, and had a subjective and improper reason for wanting to deny Mr. Holmstrand's claim in particular, that will not defeat this motion.  All that is necessary to grant summary judgment for defendants, as the discussion below will show, is that the objective facts show that defendants had a reasonable basis for denying coverage.

## II.    As A Matter Of Law, Defendants Had A Reasonable Basis To Deny Benefits.

Under the policy language, plaintiff would only be entitled to benefits if he suffered an "income loss" resulting "directly and apart from any other cause" from a "sickness."  All of these elements must be present in order to provide benefits; if any one element is missing, benefits are not payable.  Because it was at least debatable whether any of these elements were satisfied in this case, the decision to deny benefits to plaintiff had a reasonable basis under the explicit terms of the policy as applied to the facts in this matter.  As such, plaintiff's bad faith claims must fail as a matter of law.

### A.    Defendants relied on the policy language, and there has been no claim that the policy language is invalid.

As was demonstrated in the Facts section above, defendants denied plaintiff benefits relying on an explicit policy provision requiring an "income loss" resulting "directly and apart from any other cause" from a "sickness."  *Hillman II* establishes that where the insurer relies on explicit policy provisions to deny coverage, it will not have acted in bad faith.  *Id.* at 1325.  *Hillman II* quoted a leading insurance treatise:

> Although bad faith is not fully defined in some jurisdictions, courts have consistently held that a refusal to pay benefits based on a reasonable interpretation of the insurance contract is not bad faith.

*Id.* at 1324 (quoting Shernoff, *Insurance Bad Faith Litigation*, § 5.02[1] at 5-6 (1992)).

In *Hillman II*, the policy exclusion relied on by the insurer to deny coverage was found by the Alaska Supreme Court to have been invalid on statutory and public policy grounds.[5]  855 P.2d at 1325.  However, the Court found there was no evidence suggesting unreasonableness because a respectable minority of jurisdictions would uphold the provision and because two members of the

---

[5] *See Hillman v. Nationwide Mut. Fire Ins. Co.*, 758 P.2d 1248, 1251 (Alaska 1988) (*Hillman I*).

**LANE POWELL LLC**
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

Court dissented from finding the exclusion invalid. *Id.* at 1325-26. As such, the insurer was justified in relying on the exclusion and could not, as a matter of law, be liable for bad faith. *Id.*

Plaintiff has made no claim contesting the validity of the policy provision under which defendants denied benefits. Moreover, the great majority of the evidence shows that defendants had a reasonable basis to deny defense under the explicit provision of the policy limiting benefits for income loss. By relying on a valid policy provision, defendants' actions were more reasonable than the insurer in *Hillman II*, and so, like that insurer, defendants cannot be held liable for bad faith as a matter of law.

**B.   Objective evidence demonstrates a reasonable basis to dispute the "income loss" element.**

That plaintiff have an "income loss" is, of course, the point of the policy at issue. Ms. Kirby testified:

A.    This policy he has is a loss of income policy.

Q.    Right.

A.    So if he was working we would need to know that so that we would be able to determine if there was a loss of income.

Exhibit R, Kirby Depo., p. 85 ln. 10-15.

The "income loss" claimed by plaintiff was the ending of his employment from R&M Consultants. However, when in March 2003 Ms. Kirby tried to call plaintiff and learned that the number appeared to be for a motorcycle shop, she became suspicious that plaintiff may have been involved in a motorcycle business and so she requested surveillance of plaintiff to determine whether he in fact had a loss of income. *Id.*, p. 86 ln. 15-19 ("surveillance would show us if he had an actual motorcycle shop or somewhere where he would be going to either sell motorcycles or doing something with motorcycles").

The surveillance and other information developed by defendants showed that plaintiff was in fact selling expensive custom motorcycles from his home. That plaintiff had this business is not subject to dispute; plaintiff's own internet web pages stated that he ran a business from his home called "Biff's American Motorcycles" and that he sells and markets Bourget motorcycles. Moreover, this information was unbeknownst to defendants until it was discovered during the surveillance and investigation. Plaintiff submitted Claimant's Supplement Statements during the period he was

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

receiving benefits from August 2002 to September 2004, but, even though by signing on the Statements he agreed that the information therein was "true and complete," he never disclosed to defendants in the Statements, or any where else, that he owned and operated a motorcycle business. It was therefore reasonable for defendants to conclude that plaintiff actively concealed his motorcycle business from defendants.

At the very least, it is debatable whether plaintiff's operation of a motorcycle business meant that he still had an "income loss" under the policy. Therefore, at the time defendants stopped the benefit payments in September 2004 the objective evidence demonstrated a "reasonable basis" to conclude that plaintiff did not have an income loss. Under *Hillman II* defendants could not have acted with bad faith as a matter of law.

### C. Objective evidence demonstrates a reasonable basis to dispute the "directly and apart from any other cause" element.

Plaintiff's loss of employment with R&M Consultants was not due to an allowable cause (i.e., sickness) "directly and apart from any other cause." Plaintiff did not leave work because of sickness; rather, it was indisputable that he was terminated for cause, that cause being his temper and his abusive and threatening behavior to his co-workers. James Rooney, plaintiff's superior at R&M Consultants, testified at his deposition that plaintiff was not terminated because he was physically unable to do his job. Exhibit C, Rooney Depo., p. 82 ln. 14-16. Instead, Mr. Rooney agreed at his deposition that he terminated plaintiff because plaintiff wasn't able to "get along" with his co-workers, he was "aggressive and threatening" to the staff, and Mr. Rooney wasn't "going to tolerate having him work there given the way he had behaved." *Id.*, p. 82 ln. 20–p. 84 ln. 1. Plaintiff himself sent an e-mail to Mr. Rooney after his termination in which plaintiff admitted that he was terminated because of his behavior: "I failed to control myself ... I let myself go into a verbal rage that I shouldn't have." Exhibit E.

Moreover, there is evidence that plaintiff simply wanted to retire from his job. As noted above, six months prior to his termination plaintiff told his doctor that he "is tired of working and he simply cannot afford to retire." In the e-mail to Mr. Rooney sent soon after his termination, plaintiff stated: "I would like you to consider my departure from the firm to be an 'Early Retirement.'" *Id.*

**LANE POWELL LLC**
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

Further, in that same e-mail plaintiff described his departure as "appropriate at this time with regards to my medical issues, the excellent work of the long-term surveying and mapping staff in taking control of the management and marketing for our department, the currently ill-defined and misunderstood nature of my position, and the uncertain future of your retirement and the consequential future ownership of the firm." *Id.* Therefore, plaintiff himself has stated that his departure from his job was due to many causes, including causes which do not give rise to benefits under the policy. Plaintiff's own words thus show that his departure from his job did not result "*directly and apart* from any other cause, from an accident or sickness."

In addition, the fact that even after his termination plaintiff indicated that he was actively performing computer work up to the date of his departure, and that he was ready, willing and able to continue to perform many or all of the computer work duties he was performing when he was terminated, demonstrates that he did not leave his job, therefore incurring an income loss, because he was physically unable to perform it. In addition, the fact that plaintiff made purchases to re-build and repair his office computer just before he was terminated contrasts with the notion that he was nearing departure from his employment due to his inability to use his computer.

All of this information was unknown to defendants until after this lawsuit was filed, and in fact plaintiff fraudulently concealed this information. At no time prior to this case did plaintiff tell defendants he had wanted to leave his job. At no time prior to this case did plaintiff disclose that he had been terminated for a reason having nothing to do with his physical ability to do the job. Plaintiff's settlement negotiations with R&M Consultants were kept a secret from defendants. Plaintiff's counsel even ghost-wrote letters for R&M Consultants to send to defendants to support his claim for benefits. Those letters did not disclose that plaintiff was terminated for misconduct; in fact, the express purpose of the letters was to misrepresent the reasons for plaintiff's termination in order to induce defendants to falsely believe that plaintiff was not physically able to perform his job. Defendants directly and materially relied on these letters to approve benefits for plaintiff.

This evidence thus clearly reinforces defendants' decision to stop plaintiff's benefits. Based on the objective evidence above, there is more than a "reasonable basis" to conclude that plaintiff's loss of his job was not due "directly and apart from any cause" to his medical condition.



At the very least, this issue is "fairly debatable."  Under *Hillman II*, defendants could not have acted in bad faith as a matter of law.

### D.   Objective evidence demonstrates a reasonable basis to dispute the "sickness" element.

Plaintiff claimed that he had "limited" and "restricted" use of his hands.  He claimed that because of the problems with his hands and arms he could not grip the steering wheel of a car or type for more than four or five minutes.  He claimed that because of his physical problems his hobbies were limited to sedentary activities, such as reading, some chores, physical therapy, and taking care of his children.  He claimed that he had assistance in taking care of himself, even in food preparation, from his friends and children.  However, defendants' surveillance prior to stopping benefits, and the evidence uncovered in the course of this lawsuit, uncovered objective evidence directly contrary to these claims.

Defendants knew from the surveillance that, in contrast to his claim of limited use of his hands, plaintiff was observed using his hands to work around the house, work on his vehicles, and to pick up and carry various objects, with no apparent discomfort.  Plaintiff was also observed to use hand tools while working around the house and on his motorcycle and his vehicles, again with no apparent discomfort.  In addition, although plaintiff claimed he could not do his job at R&M Consultants because of his hands, the claimed problems with his hands has obviously not prevented plaintiff from operating a motorcycle dealership business.  Also in contrast to plaintiff's claim of limited use of his hands, plaintiff had used his hands to install equipment to illegally wiretap his wife.

In contrast to plaintiff's claim that he cannot hold a steering wheel for more than five minutes, during surveillance plaintiff was observed driving his motorcycle and various other vehicles around town for much more than five minutes.  It had also been discovered that prior to the stopping of benefits that plaintiff had been cited for speeding in his sports car, and had been involved in several motorcycle accidents; this evidence also indicates frequent operation of his vehicles.  In addition, plaintiff's own website shows that he goes off-roading (including taking his vehicle completely airborne) on rough terrain in his Hummer.

**LANE POWELL LLC**
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

In contrast to plaintiff's claim that he could not type or use the computer for more than four or five minutes, defendants have discovered that, even after his termination, plaintiff indicated that he was actively performing computer work up to the date of his departure, and that he was ready, willing and able to continue to perform many or all of the computer work duties he was performing when he was terminated.  In addition, plaintiff had no trouble using his computer to send numerous e-mails to his attorneys.  That plaintiff made purchases to re-build and repair his office computer just before he was terminated also contrasts with his claim that he was so crippled as to be nearly unable to use his computer.[6]

In contrast to his claim of limited and sedentary hobbies, during surveillance plaintiff was observed to ride motorcycles.  In addition, during the course of this lawsuit defendants found evidence at plaintiff's own web-site where he admits he goes off-roading with his Hummer.  Defendants also found that Plaintiff listed his hobbies on an internet dating site to include "Web Servers," "Car Racing Leagues," "Football Leagues," and "Martial Arts;" none of the activities listed by plaintiff in his Claimant's Supplemental Statements (such as reading) were mentioned on the dating site.  On the "Russian Brides Personals" site, plaintiff stated that he was "healthy" and "adventurous," which was opposite to what he was telling defendants.

Finally, in contrast to his claims that he needed assistance to care for himself, the surveillance pictures show plaintiff going about his normal daily business without apparent

---

[6]  In addition, defendants have very recently learned that plaintiff has 93 computer hard drives, containing a massive amount of information.  Attached as Exhibit AQ are December 15 and 16, 2005, letters from plaintiff's counsel listing the hard drives and their sizes.  The hard drives add up to more than 4 terabytes of information.  According to the informational website page at Exhibit AR, a terabyte contains 1 trillion bytes, and is equivalent to 50,000 trees made into paper and printed.  It would thus take 200,000 trees to print the information on Mr. Holmstrand's hard drives.  Defendants are attempting to access the data in the hard drives.  However, the very existence of such massive storage capacity is at least circumstantial evidence that (1) plaintiff operates a computer business, (2) plaintiff has a computer hobby which was not listed on his Claimant Supplemental Statements, and/or (3) plaintiff continues to be able to perform extensive computer work.

discomfort or restriction of any kind.  It is thus "fairly debatable" that plaintiff can take care of himself.

All of the information regarding plaintiff's use of his hands was not known to defendants until it was discovered during either the surveillance or this lawsuit.  Plaintiff's Claimant's Supplement Statements during the period he was receiving benefits from August 2002 to September 2004, which were supposed to be "true and complete," only reported that plaintiff had "restricted" and "limited" use of his hands.  Plaintiff never disclosed on his Claimant's Supplement Statements, or anywhere else, the truth about the extent to which he used his hands in caring for himself, his hobbies, his driving, his computer work, and his everyday activities.  Plaintiff actively concealed his actual condition from defendants.

Therefore, at the time defendants stopped benefit payments in September 2004 they had a "reasonable basis" to conclude from the objective evidence that plaintiff did not have the hand, wrist and arm limitations he had claimed.  The additional objective information uncovered in the course of this lawsuit about plaintiff's activities before the benefits were stopped reinforces defendants' conclusion.  At the very least, it is debatable whether plaintiff's had the claimed limitations.  Under *Hillman II* defendants could not have acted with bad faith as a matter of law.

## CONCLUSION

Plaintiff's laundry list of the alleged bad faith motives and conduct of defendants is essentially similar to the claims made by the insured in *Hillman II*; however, *Hillman II* held that such allegations in that case were not relevant to the "reasonableness" prong of the bad faith analysis. Instead, *Hillman II* found there was no bad faith in that case as a matter of law because the objective evidence showed a reasonable basis to deny coverage.  For the same reason, plaintiff's allegations in the instant case of bad faith conduct by defendants, even assuming they are true for the purposes of this motion, are irrelevant and cannot prevent summary judgment for defendants.  Defendants' surveillance and investigation of plaintiff has discovered objective evidence directly contrary to

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

plaintiff's representations in his claim for benefits. Defendants' interpretation of the objective evidence regarding plaintiff's income loss, the reasons why he lost his job, and his physical condition was thus at the least "fairly debatable" for the reasons discussed above. Moreover, defendants' denial of benefits was made pursuant to a valid policy provision. As such, defendants' decision to deny benefits was made on a "reasonable basis" and could not have been in bad faith as a matter of law. Therefore, defendants respectfully move the court to dismiss all bad faith claims against defendants in their entirety.

DATED this 20th day of December, 2005.

LANE POWELL LLC
Attorneys for Defendants New York Life Insurance
Company, Paul Revere Life Insurance Company,
UnumProvident Corporation, and Genex

By _____
Brewster H. Jamieson, ASBA No. 8411122

I certify that on December 20, 2005, a copy
of the foregoing was served by mail on:

Jeffrey K. Rubin, Esq.
Friedman, Rubin & White
1227 West Ninth Avenue, Second Floor
Anchorage, Alaska 99501-3218

Scott J. Hendricks Leuning, Esq.
Clapp Peterson Stowers
711 H Street, Suite 620
Anchorage, Alaska 99501-3442

_____
Nanci L. Biggerstaff, CPS, PLS
116008.0029/152399.1

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631